# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERICA LYNN CLAPPER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-1688 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | |
| CAROLYN W. COLVIN,[1] Acting as | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

## I. INTRODUCTION

Erica Clapper ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f ("Act"). This matter comes before the Court on cross motions for summary judgment (ECF Nos. 8, 10). The record has been developed at the administrative level, and for the reasons which follow, Plaintiff's Motion for Summary Judgment will be denied and Defendant's Motion for Summary Judgment will be granted.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on June 24, 2009, claiming a disability onset of January 1, 2009. (R. at 103-107).[2] Plaintiff was initially denied benefits on November 4, 2009. (R. at 66-70). A

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

hearing before an Administrative Law Judge ("ALJ"), Brian W. Wood, was held on February 10, 2011, and Plaintiff testified, represented at her request by non-attorney Stephanie Tecza. (R. at 28-59). A vocational expert was also present to testify. (R. at 28-59). The ALJ issued his decision denying benefits to Plaintiff on March 25, 2011. (R. at 8-25). Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council, which was denied on September 15, 2011, thereby making the ALJ decision the final decision of the Commissioner. (R. at 1-6).

Plaintiff filed her Complaint in this Court on November 29, 2012. (ECF No. 3). Defendant filed an Answer on February 4, 2013. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10). The matter has been fully briefed. (ECF Nos. 9, 11, 12, 15).

## III. STATEMENT OF FACTS

### A. *General Background*

Plaintiff was born on March 22, 1991, was eighteen years of age at the time of her application for benefits, and was twenty years of age at the time of the ALJ's decision. (R. at 33). Plaintiff graduated from Butler Area Senior High School, however, was identified to have a specific learning disability and emotional disturbance and was enrolled in an Individualized Educational Program. (R. at 35-36, 166, 170). Plaintiff began working part-time for Goodwill in October of 2010 and was still working there at the time of the administrative hearing. (R. at 38, 47, 152, 398). Plaintiff lived with her family at all relevant times (R. at 34).

### B. *Physical Health History*

On April 7, 2008, Plaintiff saw her family doctor, Michael J. Wahl, M.D., for a physical examination. (R. at 305). At this visit, Dr. Wahl concluded that Plaintiff was doing well and did

---

[2] Citations to ECF Nos. 6-2-10, the Record, *hereinafter*, "R. at __."

not diagnose her with any impairments. (R. at 305). On February 9, 2009, Dr. Wahl diagnosed Plaintiff with headaches, recommended blood work, and prescribed Topamax. (R. at 303).

On February 22, 2009, Plaintiff went to the Emergency Room because she was experiencing blurred vision, nausea, and headaches. (R. at 244). Plaintiff was diagnosed with headaches and abdominal pain. (R. at 258, 260). Plaintiff had also recently been diagnosed with Lyme disease and was taking amoxicillin. (R. at 244, 252, 286). A CT scan from this visit found no intracranial hemorrhage or mass effect and Plaintiff was discharged. (R. at 252, 254, 324). Dr. Wahl's notes provide that on February 24, 2009, he advised Plaintiff's mother that complying with this medication was of the "utmost importance." (R. at 300).

On March 16, 2009, Dr. Wahl examined Plaintiff and diagnosed her with headaches and Lyme disease. (R. at 299). During this session, Plaintiff reported that she was feeling much better overall and that her headaches were "getting better." (R. at 299). Dr. Wahl noted that "[Plaintiff] actually looks and is acting much better." (R. at 299). On April 21, 2009, Dr. Wahl examined Plaintiff regarding a stomachache and prescribed Nexium. (R. at 298). Dr. Wahl's notes from this session provide that Plaintiff had been non-compliant with her medications. (R. at 298). On April 22, 2009, Plaintiff returned to the Emergency Room and was diagnosed with visual disturbance, abdominal pain, and urinary tract infection. (R. at 225). Plaintiff was prescribed medication, her condition was stabilized, and she was discharged to go home. (R. at 221, 225). An MRI of Plaintiff's brain conducted on April 27, 2009 displayed prominence of the pituitary gland and right sphenoid sinus disease. (R. at 284, 323).

On April 29, 2009, Thomas McGill, M.D., examined Plaintiff on referral from Dr. Wahl. (R. at 210). Plaintiff complained of headaches, nausea, vomiting, and problems with her vision. (R. at 210). Dr. McGill observed that Plaintiff was normally developed and contemplated that

3

she could have a "false positive Lyme test with no IgC conversion." (R. at 210). On May 4, 2009, Constantine A. Balouris, M.D., conducted an eye examination of Plaintiff, and her vision was determined to be within the normal limits. (R. at 346-349).

During an annual physical examination on May 22, 2009, Plaintiff informed Dr. Wahl that she was still experiencing headaches. (R. at 296). Dr. Wahl noted that Plaintiff was "hit and miss with her meds still" and was "doing okay." (R. at 296). A follow-up MRI of Plaintiff's brain on May 13, 2009 showed "borderline size of the pituitary gland which is a nonspecific finding without any signs of any adenoma" and that "[t]he remainder of the MRI of the brain [was] unremarkable." (R. at 282, 322).

On June 25, 2009, Munir Y. Elawar, M.D., examined Plaintiff on referral from Dr. Wahl and diagnosed her with headaches and the possibility of seizures. (R. at 290-294). Dr. Elawar opined that Plaintiff would benefit from further testing, including an EEG and MRI. (R. at 292). Dr. Elawar believed Plaintiff would benefit from medication, however, "her mother said she is not good with taking medications and the patient does not want medications." (R. at 292).

On November 4, 2009, Juan B. Mari-Mayans, M.D., conducted a Physical Residual Functional Capacity of Plaintiff. (R. at 377-383). Dr. Mari-Mayans did not physically examine Plaintiff but reviewed her medical records and diagnosed her with headaches and a history of Lyme disease. (R.at 377, 382). Dr. Mari-Mayans opined that Plaintiff can occasionally lift and/or carry 50 pounds, can frequently lift and/or carry 25 pounds, can stand and/or walk for a total of about 6 hours in an 8 hour day, and can sit for a total of about 6 hours in an 8 hour day. (R. at 378). Dr. Mari-Mayans also found Plaintiff's statements to be "partially credible" and noted that "[Plaintiff] has described daily activities that are not significantly limited in relation to her

alleged symptoms" and "treatment has generally been successful in controlling her symptoms." (R. at 382).

## C. *Mental Health History*

On September 25, 2006, when Plaintiff was fifteen years old, Patricia M. McGuire, M.D., performed a psychiatric evaluation of Plaintiff "due to poor academic performance, problems with attention and organization and difficulty handling anger and frustration." (R. at 384). Dr. McGuire observed that Plaintiff had normal speech, had an irritable and bored affect, and her cognition was grossly intact. (R. at 386). Further, Plaintiff exhibited no motor abnormalities, no suicidal ideation, and no evidence of looseness of associations, thought blocking or flight of ideas. (R. at 386). Dr. McGuire diagnosed Plaintiff with attention deficit hyperactivity disorder, oppositional defiant disorder, and learning disorder. (R. at 386). Plaintiff had a Global Assessment of Functioning ("GAF") score of 45 at this session.[3] (R. at 386).

In February 2009, Plaintiff was enrolled in an Individualized Educational Program at Butler Area Senior High School, which consisted of basic, regular, and learning support classes. (R. at 170, 182). Plaintiff was identified with a specific learning disability in basic reading skills and mathematic problem solving as well as severe emotional disturbance. (R. at 166, 174). Plaintiff had a verbal IQ score of 83 and a full scale IQ score of 78. (R. at 181). The report noted that "[Plaintiff] worked successfully academically at the senior high this year" and was proficient in English. (R. at 170, 175).

---

[3]    The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed.2000). An individual with a GAF score of 41–50 may have "[s]erious symptoms (e.g., suicidal ideation...)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

On October 23, 2009, state consultative examiner T. David Newman, Ph.D., conducted a clinical psychological disability evaluation and intellectual evaluation regarding Plaintiff's claim for SSI. (R. at 353-358). Dr. Newman diagnosed Plaintiff with borderline intellectual functioning ("BIF"). (R. at 356). Plaintiff reported that she did laundry, went on the computer, liked to "hang out with friends," and had a boyfriend. (R.at 354). Dr. Newman noted that Plaintiff "whine[d]" during the examination and was "was lethargic and reluctant to make an effort throughout the interview and testing." (R. at 353-354, 356). Nevertheless, Dr. Newman observed that Plaintiff's "speech content was consistently relevant, rational, and coherent," she exhibited a euthymic mood, her concept formation was intact, and had a weak fund of general information. (R. at 354). Further, Plaintiff was oriented, her memory functioning was reasonably intact, her social judgment and test judgment were sufficient, she had good insight, and she had not indicated a disturbance of impulse control and related hostility, aggressiveness, or sexuality. (R. at 354-355). Dr. Newman assessed Plaintiff with a verbal IQ score of 74, a performance IQ score of 79, and a full scale IQ score of 75. (R. at 355).

Dr. Newman's report contained a pre-printed form and he made check marks under the column on that form titled "marked limitations" regarding Plaintiff's ability to interact appropriately with supervisors, respond appropriately to work pressures, and respond appropriately to changes in the work routine. (R. at 357). In an explanatory summary, Dr. Newman opined that Plaintiff was capable of receiving and carrying out instructions for simple and repetitive tasks, however, cautioned that Plaintiff's attitude could pose a problem regarding more detailed tasks. (R. at 356). Dr. Newman believed that Plaintiff lacked the necessary experience and intellectual functioning to personally manage her funds. (R. at 356).

On October 28, 2009, non-examining state agency psychologist John Rohar, Ph.D., issued a mental residual functional capacity assessment and psychiatric review technique of Plaintiff. (R. at 359-376). Dr. Rohar concluded that Plaintiff had medically determinable impairments of BIF and specific learning disability. (R. at 361, 364, 367). According to Dr. Rohar, Plaintiff could perform simple, routine, repetitive work in a stable environment; could understand, retain, and follow simple job instructions; could make simple decisions; was capable of asking simple questions and accepting instructions; and could function in production oriented jobs requiring independent decision making. (R. at 361). Dr. Rohar filled out a form where he found Plaintiff was either "not significantly limited" or "moderately limited" for all of the questions. (R. at 359-360). Based on the totality of the medical evidence that Dr. Rohar relied upon, he decided that Plaintiff's subjective complaints were not reliable. (R. at 361).

On October 14, 2010, Randon Simmons, M.D., conducted a psychiatric evaluation on Plaintiff. (R. at 388-391). Dr. Simmons diagnosed Plaintiff with mood disorder NOS and personality disorder NOS with dependent and obsessive compulsive traits. (R. at 391). Plaintiff received a GAF score of 35 at this session.[4] (R. at 391). Dr. Simmons observed that Plaintiff's speech was normal in tempo and volume, her motor activity was not abnormal, her mood was dysphoric, her affect was inappropriate at times, her thoughts were organized, and she had below-average intelligence, good memory, poor insight, and poor judgment. (R. at 390). Plaintiff denied suicidal ideation and hallucinations. (R. at 390). Dr. Simmons noted in his report that Plaintiff refused to take medication as advised, and her mother said that Plaintiff "needs more mental health history and a diagnosis in order to get [SSI] benefits." (R. at 388).

---

[4] An individual with a GAF score of 31–40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed.2000).

Plaintiff saw Dr. Simmons again on November 29, 2010. (R. at 394-401). Dr. Simmons noted that Plaintiff was "slightly more comfortable, interactive, and engaging" during this session. (R. at 398). Plaintiff reported that she had been taking her medication and drove to the appointment. (R. at 398). Plaintiff also informed Dr. Simmons that she began working at Goodwill sometime in October and stated that "it's really easy." (R. at 398).

**D. *Administrative Hearing***

Plaintiff appointed non-attorney Stephanie Tecza to represent her at the administrative hearing. (R. at 28-59, 102). Ms. Tecza told the ALJ that she had known Plaintiff through her work in the PEAL Center,[5] where she was as a parent advisor involved in education advocacy. (R. at 32). Ms. Tecza informed the ALJ that she had never represented anyone in a hearing before. (R. at 55). Ms. Tecza had an opportunity to examine the file prior to the hearing and prepared a summary of the evidence, which she submitted to the ALJ during the hearing. (R. at 31-32, 153-164).

Plaintiff testified that she lived at home with her parents. (R. at 34). At the time of the hearing, Plaintiff was working four days a week at Goodwill, which allowed her to pay her phone bill and buy food. (R. at 34-35, 38). At work, Plaintiff operated a cash register, put clothes away, and assisted her mentally challenged co-workers. (R. at 37-38). She was paid every two weeks and her most recent pay check at the time of the hearing was for approximately $230. (R. at 38). Plaintiff had a driver's license and said that she only drove alone when she traveled to work. (R. at 35).

---

[5] "The PEAL Center is an organization of parents of children with special health care needs and disabilities reaching out to assist other parents and professionals." The PEAL Center, http://www.pealcenter.org/aboutus/aboutpeal.php (last visited Nov. 19, 2013). "The Mission of the PEAL Center is to ensure that children, youth, and adults with disabilities and special health care needs lead rich, active lives and participate as full members of their schools and communities by providing training, information, and technical assistance based on best practices to individuals, families and all people who support them." Id.

Plaintiff graduated from high school but was enrolled in an Individualized Educational Program, which included special education courses. (R.at 35-36). She testified that she could write, count money, and read, but had difficulty doing so. (R. at 36-37). Plaintiff also stated that she went to the mall and grocery store with her mother and went out to eat with friends. (R. at 35, 48). She testified that she used a computer and sent friends text messages, including her ex-boyfriend. (R. at 48). Regarding household chores, Plaintiff said that she would run the sweeper, however, refused to clean dishes, which she considered disgusting. (R. at 47). Ms. Tecza asked Plaintiff if her "cleanliness issue" affected her work and she replied that if there was a spill in the store, she would not clean it up and instead would notify a utility man to do so. (R. at 50-51).

The ALJ asked Plaintiff about her treatment with Dr. Elawar and Plaintiff said she never got the EEG done because it required putting glue in her hair. (R. at 40-41). Plaintiff testified that Dr. Wahl was her family doctor and that she was still seeing him. (R. at 41). Plaintiff also stated that she was prescribed medication by "some guy at Irene Stacy's" but could not remember his name. (R. at 41-42). She stopped taking this medication because she did not think it would work. (R. at 44). Plaintiff testified that she had headaches three days per week and that 500 milligram Tylenol helped, but she tried to avoid using it. (R. at 45-46). Plaintiff was asked about her history of Lyme disease and she said it had gotten better and that her eye problem was better as well. (R. at 46).

Following Plaintiff's testimony, the ALJ questioned the vocational expert. (R. at 51-56). The ALJ first stated that Plaintiff had no past relevant work and then asked whether a hypothetical person of Plaintiff's age, education, and work experience would be eligible for a significant number of jobs in existence in the national economy if limited to: lifting and carrying fifty pounds occasionally, lifting and carrying twenty-five pounds frequently, standing or

walking for six hours of an eight-hour work day, sitting for six hours of an eight-hour work day, performing simple, routine, repetitive tasks, requiring low-stress work (defined as occasional, simple, decision making and occasional changes in the work setting), cannot perform work in a fast-paced production environment, can have occasional interaction with co-workers, supervisors, and the public, and limited to only basic reading, writing, and math skills. (R. at 52). The vocational expert responded that such a person would be capable of working as a dishwasher, with 209,000 such jobs available nationally, as a janitor, with over 1,000,000 such jobs available, and as a grounds worker, with about 100,000 such jobs available. (R. at 52-53).

The ALJ went on to ask whether jobs would be available to a person with the additional limitation of working in relatively clean environments. (R. at 53). The vocational expert replied that such a person would be capable of working as a stock clerk, with 118,000 such jobs available, as a packer at the light level, with 206,000 such jobs available, and as a bagger, with 100,000 such jobs available. (R. at 54). Then the ALJ asked whether there would be any work available if someone was off-task twenty percent of the work day and the vocational expert responded in the negative. (R. at 54). The ALJ asked the vocational expert whether his testimony was consistent with the information in the Dictionary of Occupational Titles, to which the vocational expert answered in the affirmative. (R. at 54).

Ms. Tecza next had the opportunity to examine the vocational expert. (R. at 54-56). However, she struggled in framing proper questions. (R. at 54-56). The ALJ assisted Ms. Tecza by explaining how to appropriately ask questions but she continued to have difficulty. (R. at 54-56). The ALJ ultimately asked the vocational expert whether an individual that had three outbursts with supervisors or co-workers per month would be able to retain employment, and the vocational expert answered in the negative. (R. at 56).

Several times throughout the hearing the ALJ advised both Plaintiff and Ms. Tecza of the importance of attaining a complete medical record. (R. at 39-40, 42, 56-58). The ALJ requested that Ms. Tecza get additional medical records from Irene Stacy, Dr. Wahl, and Dr. Elawar and said he would hold the record open for twenty days in case she had difficulty gathering these records. (R. at 56-57). Then the ALJ mentioned it might be easier on Ms. Tecza if his office obtained the records, asked Plaintiff if she wished to sign three (3) release forms, and announced he would make his decision after he considered the new medical evidence. (R. at 58).

## IV. STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Brewster v. Heckler, 786 F.2d 581, 583 (3d Cir.1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see Barnhart v. Thomas, 540 U.S. 20, 24–25, 124 S.Ct. 376, 157

L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs in the national economy. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir.1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[6], 1383(c)(3)[7]; Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir.1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. See 5 U.S.C. § 706. The District Court must then determine whether substantial evidence exists in the record to support the Commissioner's findings of fact. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir.2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 390. A

---

[6] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[7] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

District Court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. Palmer v. Apfel, 995 F.Supp. 549, 552 (E.D.Pa.1998); S.E.C. v. Chenery Corp., 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis, Chenery, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion ... so long as the agency's fact finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190–91 (3d. Cir.1986).

## V. DISCUSSION

In his decision, the ALJ concluded that Plaintiff's work at Goodwill did not rise to the level of substantial gainful activity. (R. at 13). The ALJ found that Plaintiff had the following severe impairments: Lyme disease, learning disorder, mood disorder, BIF, and personality disorder. (R. at 13). As a result of said impairments, the ALJ found that

> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c). [Plaintiff] has the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently, she can stand or walk for 6 hours of an eight hour workday. She can sit for 6 hours of an eight-hour workday. She is able to perform simple, routine, repetitive tasks. She requires low-stress work defined as occasional simple decision-making and occasional changes in the work setting. She cannot perform work in a fast-paced production environment. She can have occasional interaction with coworkers and supervisors and the public. She is limited to only basic reading, writing and math skills.

(R. at 16). Based upon the testimony of the vocational expert, the ALJ determined that Plaintiff was capable of engaging in a significant number of jobs in existence in national economy. (R. at 22-23). Plaintiff was not, therefore, awarded SSI. (R. at 23).

Plaintiff objects to the decision of the ALJ, arguing that he erred by failing to secure a waiver of counsel from Plaintiff, improperly disregarding the medical opinion of Plaintiff's treating physicians, improperly determining Plaintiff's residual functional capacity ("RFC"), and improperly disregarding the testimony of the vocational expert and relying on an incomplete hypothetical question. (ECF No. 11 at 7-15). Defendant counters that waiver of counsel is not an issue because Plaintiff did not appear pro se and was represented a non-attorney at the hearing, and argues in the alternative, that if Plaintiff proceeded pro se, she knowingly and intelligently waived her right to counsel and the ALJ adequately developed the record. (ECF No. 12 at 2-8). Defendant also contends that the ALJ reasonably assessed the evidence of record, reasonably assessed Plaintiff's RFC, posed a reasonable hypothetical to the vocational expert, and provided substantial evidence to support his decision, so his decision should be affirmed. (ECF Nos. 9, 12). The Court agrees with Defendant.

Plaintiff first argues that the ALJ failed to secure an adequate waiver of counsel. (ECF No. 11 at 7-9). Within this argument, Plaintiff seems to contend that Ms. Tecza's representation of Plaintiff amounted to ineffective assistance and that Plaintiff was without notice of her right to be represented by legal counsel. (ECF No. 11 at 8-9). With respect to whether Plaintiff had notice of her right to counsel, the Third Circuit has held that two letters sent on the same day from the SSA advising the claimant of his right to be represented by an attorney or other representative constituted sufficient notice. Phifer v. Comm'r of Soc. Sec., 84 F. App'x 189, 191

(3d Cir. 2003). In this case, Plaintiff received at least four such notices from the SSA. (R. at 69, 71, 75-83, 91). She had sufficient notice of her right to be represented by an attorney.

Plaintiff asserts that the ALJ failed to advise her on the record of "the manner in which an attorney would aid in the proceedings, the possibility of free counsel or a contingency arrangement, or limitations on attorney's fees to 25 percent of past due benefits with Court approval of fees," which is required in the Seventh Circuit to ensure valid waivers of representation. (ECF No. 15 at 4); see Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007). However, the Third Circuit does not require that "ALJs explain each of these listed items that the Court of Appeals for the Seventh Circuit case law requires" in order to obtain an effective waiver of representation. Vivaritas v. Comm'r of Soc. Sec., 246 Fed. App'x 155, at n. 1 (3d Cir. 2008)(citing Skinner, 478 F.3d at 841). The Third Circuit "has declined to adopt a rigid protocol for an ALJ to follow when obtaining a waiver of representation." McGrew v. Colvin, 13CV0144, 2013 WL 2948448, *5 (W.D. Pa 2013)(citing Vivaritas, 478 Fed. App'x at 158 n. 1).

Moreover, Plaintiff did not waive her right to have a representative at the hearing because she was represented by Ms. Tecza. A claimant may have a representative, see 20 C.F.R. § 416.1500, and may appoint a person who is not an attorney to be her representative. 42 U.S.C. § 406(a)(1); 20 C.F.R. §§ 404.1705, 416.1505. Plaintiff appointed Ms. Tecza to be her representative and Ms. Tecza appeared on behalf of Plaintiff at the hearing. (R. 28-59, 102).[8] In Carmichael v. Barnhart, 104 F. App'x 803, 805 (3d Cir. 2004), the claimant argued that he received ineffective assistance of counsel because he was represented by a non-attorney,

---

[8] Plaintiff asserts in her Reply Brief that Plaintiff did not knowingly and intelligently waive her right to counsel because on the Appointment of Representative form, the box stating that Ms. Tecza would be representing her in connection with her SSI claim was not checked. (ECF No. 15 at 5). Plaintiff filled in Ms. Tecza's name on the form under the Appointment of Representative section and provided her signature; and Ms. Tecza filled in her own name under the Acceptance of Appointment section, marked that she a non-attorney, and provided her signature. (R. at 102). This form was completed on the day of the ALJ hearing and Ms. Tecza did, in fact, appear on behalf of Plaintiff at the hearing.

however, the Third Circuit held that the ALJ fulfilled his duty to fully develop the record so it affirmed the judgment of the District Court. "Because of the inquisitorial nature of Social Security proceedings, it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Carmichael, 104 F. App'x at 805 (citing Sims v. Apfel, 530 U.S. 103, 111 (2000)) (internal quotations omitted). "Such reasoning is further supported by the fact that a large portion of Social Security disability benefits claimants either have no representation at all or are represented by non-attorneys." Carmichael, 104 F. App'x at 805 (citing Sims, 530 U.S.at 111 (2000)) (internal quotations omitted). In this case, the ALJ appropriately developed the record. He elicited testimony from Plaintiff regarding her subjective complaints, daily activities, and treatment with her doctors. The ALJ's examination of the vocational expert developed favorable evidence both for and against granting benefits. Additionally, the ALJ kept the record open so that Plaintiff could submit additional medical records and offered to obtain those records to make it easier on Plaintiff's representative. The ALJ fulfilled his duty to fully develop the record.

Plaintiff next argues that the ALJ improperly disregarded the medical opinion evidence of Plaintiff's treating physicians. (ECF No. 11 at 9-12). Specifically, Plaintiff asserts that the ALJ erred by giving Dr. Newman's opinion little weight regarding Plaintiff's "marked limitations" in the report, but giving "significant weight" to the rest of the report. (ECF No. 11 at 9-10; R. at 20). The "opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011)(quoting Brown v. Astrue, 649 F.3d 193, 197 n. 2 (3d Cir.2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008).

Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. Plummer v. Apfel, 186 F.3d 422, 430 (3d Cir. 1999)(citing Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir.1991)). "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" and if "unaccompanied by thorough written reports, their reliability is suspect." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (internal quotations omitted).

Here, Dr. Newman's report contained several pages of written notes and explanations of his treatment of Plaintiff as well as a pre-printed form at the end where he checked boxes, including three that said that Plaintiff had "marked limitations." (R. at 355-358). The ALJ afforded these marked limitations little weight, stating that they were not supported by Dr. Newman's examination of Plaintiff or Dr. Newman's written notes in the report. (R. at 20) Further, the ALJ found the marked limitations were not consistent with Plaintiff's part-time work at Goodwill. (R. at 20). See Russo v. Astrue, 421 F. App'x. 184, 189 (3d Cir. 2011)(finding it notable that the claimant continued to work after her alleged onset of disability even though that work did not reach the level of substantial gainful activity); 20 C.F.R. § 404.1571 (work done during alleged disability period may show that claimant can work at substantial gainful activity). As such, the ALJ's granting the weight he did to the marked limitations in Dr. Newman's report was not error.

Plaintiff also asserts that the ALJ erred by giving "great weight" to the opinion of non-treating psychologist Dr. Rohar. (ECF No. 11 at 11-12; R. at 21). Plaintiff argues that Dr. Rohar's opinion should not be given significant weight because Dr. Rohar did not have an opportunity to review the reports and consider the additional diagnoses of Dr. McGuire and Dr. Simmons, which were not in the record at the time Dr. Rohar issued his opinion. (ECF No. 11 at

11-12). There will always be time lapse between the state agency report and the ALJ review because the state agency report occurs first. Chandler, 667 F.3d at 361. An update to the state agency report will only be required when "additional medical evidence is received that *in the opinion of the [ALJ]*...may change the State agency medical...consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing." Id. (quoting and adding emphasis to SSR 96-6p (July 2, 1996)). The ALJ did not conclude an update to the report was necessary. It was also not error that the ALJ relied on a state agency opinion. Such opinions deserve significant consideration. Chandler, 667 F.3d at 361. In this case, the ALJ did not simply "rubber stamp" Dr. Rohar's RFC conclusion, but rather considered and discussed all of Plaintiff's medical treatment and daily activities, and incorporated Dr. Mari-Mayans physical RFC assessment into his RFC. *See* Id. More importantly, despite Dr. Rohar opining that Claimant is capable of performing "production oriented jobs requiring independent decision making," the ALJ made clear in his RFC that Plaintiff cannot work in a fast-paced production environment. (R. at 16, 361).

Plaintiff next argues that the ALJ erred by giving little weight to her GAF scores as assessed by Dr. McGuire and Dr. Simmons. (ECF No. 11 at 10; R. at 18-19). Without citing any case law, Plaintiff asserts that "[a] GAF score of 50 or lower is typically considered disabling as an individual has severe impairments with a score of 50 or lower." (ECF No. 11 at 10). Such an argument is without merit. A GAF score does not establish disability unless it was meant to indicate an impairment of the ability to work. Bracciodieta-Nelson v. Comm'r of Soc. Sec., 782 F.Supp.2d 152, 165 (W.D.Pa. 2011). GAF scores "are only medical evidence that informs the Commissioner's judgment of whether an individual is disabled." Rios v. Comm'r of Soc. Sec., 444 F. App'x 532, 535 (3d Cir. 2011). The ALJ determined that the GAF score of 45 contained

in Dr. McGuire's psychiatric evaluation was to be given the weight that it was because it was inconsistent with Plaintiff's numerous activities, performance in school, and treatment history. (R. at 18). Further, this score occurred almost three years prior to Plaintiff's alleged onset of disability at a point when she does not contend she was disabled. The ALJ also considered a GAF score of 35 contained in Dr. Simmons' psychiatric evaluation and accorded it little weight, finding that it was "inconsistent with [Dr. Simmons'] own examination of [Plaintiff]" and was inconsistent with Plaintiff's ability to work part-time at Goodwill. (R. at 19). Such explanations provided by the ALJ are reasonable and it was not an error to accord these GAF scores the weight given.

Plaintiff also asserts that the ALJ's RFC is not supported by substantial evidence. (ECF No. 11 at 12-14). This Court disagrees. Determining whether Plaintiff is disabled is a decision that is to be made solely by the ALJ. 20 C.F.R. § 404.1527(d)(1). An ALJ weighing the credibility of evidence "must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000). The ALJ must also consider Plaintiff's subjective symptoms and explain his reason(s) for rejecting such testimony. Id. In this case, the ALJ provided a thorough discussion regarding his assessment of Plaintiff's RFC, which totaled six pages. (R. at 16-21). The ALJ discussed Plaintiff's testimony at the hearing, Plaintiff's physical and mental medical evidence, and how Plaintiff's subjective complaints compared to her objective medical evidence and daily living activities. (R. at 16-21). The ALJ gave specific reasons and explanations for the weight he accorded to each medical opinion contained in the record as well as his credibility determinations. The ALJ's RFC was supported by substantial evidence.

Finally, Plaintiff asserts that the ALJ improperly disregarded the testimony of the vocational expert. (ECF No. 11 at 14-15). Plaintiff argues that the ALJ "chose to ignore" the vocational expert's answers that would have resulted in Plaintiff being unable to work in the national economy. (ECF No. 11 at 15). The ALJ, however, did not ignore these responses by the vocational expert and actually addressed them, explaining that "these limitations were not consistent with the evidence of the record, and did not accurately reflect [Plaintiff's RFC]." (R. at 23). Plaintiff further argues that the ALJ erred by failing to ask the vocational expert questions regarding the limitations as noted in Dr. Newman's report. "[T]he ALJ must accurately convey to the vocational expert all of claimant's *credibly established limitations.*" Rutheford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)(citing and adding emphasis to Plummer, 186 F.3d at 431). As discussed above, the ALJ reasonably gave little weight to those limitations, so failure to ask about them was not error. Therefore, because the ALJ's RFC assessment of Plaintiff was supported by substantial evidence and the ALJ relied on the testimony of the vocational expert, who found that jobs in the national economy existed based on Plaintiff's limitations, there is no error here.

## V. CONCLUSION

Based on the foregoing, the Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted. An appropriate order follows.

Mark R. Hornak
United States District Judge

Dated: November 26, 2013
cc: All counsel of record